The jury being sworn in this case, a paper-writing was produced in the words and figures following, that is to say:
"Ten days after this 22 June, 1793, I promise to pay to William Cutlar, or order, for value received, one hundred and seventy-five pounds, ten shillings currency. Witness my hand and seal, day and date first above written.
£ 175.10. JOHN HALL. (SEAL.)" *Page 142 
(194) On the back of said paper-writing were the following endorsements, viz.:
"Pay the within to Geo. Hooper, or order. W. M. CUTLAR."
"Pay the within to J. Ingram, Esq., or order. G. HOOPER."
It appeared, on inspection of the paper, that there was not a subscribing witness to it, but that there was a seal; and the plaintiff's counsel offered a witness to prove the handwriting of the defendant. to support the action. To this the defendant's counsel objected, as insufficient in law to support the action.
The court, therefore, directed the witness to be sworn, and a verdict to be taken, and reserved the question of law, on the above objection, for further consideration.
It was further objected in the case that an action of debt cannot be maintained on the writing produced; whereon, also, the court took time to advise; and it is agreed, in case the court shall be of opinion that, on either of these objections, the plaintiff ought not to recover, then a nonsuit shall be entered.
But if the court should be of opinion that both these objections are invalid in point of law, then judgment to be entered for the plaintiff.
The witness not only proved the name subscribed, but also the word seal, written in the circumference of the seal and scratched with a pen, to be in the handwriting of the defendant.
At October Term, 1795, the Court gave their opinion as follows:
Before we proceed to the immediate investigation of the first question, Whether, in the case of a sealed instrument, unattested by any subscribing witness, the handwriting of the party may be admitted in evidence, it may be proper to take a view of the origin of deeds, in our law, and of the various changes and alterations the law has undergone with respect to that species of instruments, in order to be accommodated to the different circumstances which different periods of time have produced. This may have a stronger tendency to place the present question in a true light than perhaps any method of treating the subject that could be devised.
Let us consider, therefore, (1) the origin of reducing contracts to writing; (2) the origin of sealing, with the uses that have been made of it at different periods; (3) the origin of delivery.
We will then consider the only circumstance essential to the (195) constitution of a deed at this day, and, lastly, from all these premises, we will draw conclusions applicable to the point now in controversy. *Page 143 
(1) All writers agree that the northern nations of Europe, who spread themselves over the southern and western parts of it, were an illiterate people, who despised all arts but those of war. The Saxons who founded the Heptarchy in England, and afterwards the English monarchy, were part of those people; they had, in general, no knowledge of letters; their laws and customs, their legal ceremonies, were preserved and transmitted to others and to posterity by tradition only. To keep up a military spirit, and to have a band of warriors always ready at command, it was the universal practice of the conquering leaders of these nations to divide the conquered country into allotments, which were parceled out to their followers: first, at the will of the lord or leader; next, for the better encouragement of agriculture, for life; and, last of all, forever or in fee. About the time when it began to be usual to make these grants for life, the Christian religion, under the auspices of the Papal see, was propagated in England by St. Augustine and others, and was soon adopted and received as the national religion. Its priests were men of some learning; they here, as in all other places where they have been received, began to grasp at temporal advantages; they inculcated upon the minds of the people that it was an act of the most meritorious piety to provide for the maintenance of the ministers of God. This doctrine had its effect, and donations of allotments of land began to be made to the Church, also for life; but this life was supposed to be perpetual, as the Church never died. The donations of these allotments, for want of a better method of perpetuating the transaction among the laity, who knew nothing of letters, had always been made by livery of seizin, done in the most solemn form, to impress it on the mind, before a number of the co-vassels or tenants of the lord, who, in case of a dispute, were assembled in the lord's court, and determined chiefly by the remembrance which these impressions had made between the parties. The presumption was that if some who were present, from length of time, had forgotten some of the circumstances or conditions annexed to the donation, others of them might remember them, and so, by the united remembrance of all together, might, in the end, ascertain the true (196) state of facts. This, by the way, I suspect was the origin of juries, and of the unanimity required in their decision. Each juror contributed the circumstances lodged in his mind to the general stock of information which formed the verdict, and by conference with his fellows, brought to their recollection the circumstances which he remembered and the others, or some of them, had forgotten, until at length the whole transaction was renovated in the minds of all. This mode of conveyance answered the purpose sufficiently when donations were for the life of an individual only; for it would seldom happen that he would *Page 144 
survive all the other pares of the lord's court who were present at the investiture. But when donations were made for life to a churchman, for the benefit of his Church, and it was a received maxim that the Church never died, this method no longer answered the purpose as to them; for the donation might have continuance, and the conditions upon which it was made might come in question, after every one of the pares
present at the investiture were no more, and then the allotment might be liable to be resumed by the lord — all lands included in his territory or manor, not granted to one of his vassals, belonging to him; and, after the death of all the pares, no evidence remained of the investiture, much less the conditions annexed thereto. It became necessary, therefore, when the Church was concerned, to have some other mode of perpetuating the transaction than mere livery of seizin; and the clergy, being the learned part of the community, devised the mode of reducing the terms of the donation to writing. Sullivan, 82. And when the lord, on account of sickness, the distance of the land from his place of residence, his being employed in some other business, or some other cause, could not go upon the land to make livery, then the writing containing the terms of the donation was solemnly delivered, before the peers of the Court also, in lieu of the land; to the end that, being delivered before them in so solemn a form, they might be witnesses of the investiture of the land mentioned therein, and might be able upon trial to ascertain the identity of the paper delivered should the dispute happen in their time. This was not, indeed, a complete investiture of itself; it was termed the improper investiture, and bound the lord to make a more formal livery of seizin of the land contained in the deed at a future day, and was a sufficient security to the donee in the interim. Experience evidenced the safety and certainty there was in reducing these landed contracts into (197) writing in the case of churchmen, and the laity, wishing to be as secure as possible in their possessions, adopted by degrees the same method; which afterwards, when these allotments were extended to the heirs of the possessor, became equally necessary for the laity as the clergy, and from that time deeds of feoffment, to accompany the livery of seizin, became generally used, though the livery of seizin was good without them; and these contracts in writing, being found so advantageous in perpetuating the terms and conditions of a landed donation, were, by degrees, converted to the purpose of perpetuating other contracts that concerned only personal estate, which formerly, amongst the unlettered Saxons, were completed by shaking of hands only. 2 Bl. Com., 448.
(2) The preserving the remembrance of a landed contract having thus become general in the times of the Saxon government in England, and *Page 145 
the general illiterature of the laity of all ranks prevailing universally, it was customary for them to put some mark, usually the sign of the cross, to identify, as well as they could, the writing they had agreed to; and this was done coram paribus, who, upon the trial, might remember it, or be able to distinguish it from some circumstance attending the making the deed or the mark itself. But upon the Norman conquest, it became the policy of the conqueror and his sons to abolish the Saxon customs, and for this purpose to draw as many causes as possible to be determined in the curia regis, where the judges were Normans (Sullivan, 339, 343, 369, 374), where the pares of the neighborhood were frequently not called upon to decide between the litigants, as they uniformly were in the courts of Saxon institution, the county court, hundred court, etc. About this period the bishop was separated from the sheriff in his county court; and it was established as a rule that the county court had not cognizance of any demand of more than forty shillings value; the consequence of which must have been that all causes were carried in curia regis;
and it must frequently have happened, also, that the marks affixed to the deeds, for want of the pares, were incapable of any distinction, and, of course, any proof of the identity of the instrument. This produced an inconvenience. The greatest men among the laity could not write their names, so as to give a proof of identity that way, and being under the necessity of providing some more certain criterion of identity than that of the sign of the cross, they introduced for (198) the first time into England the practice of impressing their writings with a seal. Sulliv., 374; Terms de ley, verbo Fait; Gilb. Law of Evid., 17, 18, 20, 78. The seal exhibited the emblem which its owner had affixed to his person, when covered in the field with his coat of mail, and which being portrayed upon some conspicuous part of his dress, served to designate his person. These symbols came to be very much in use at the time of the crusades to the Holy Land, in the time of Richard I. and after, and were continued by the knights and other persons, who then used them by way of distinction in their families after their return home. The seal, therefore, of any distinguished person could immediately be known by inspection only. This method of sealing, however, was not introduced all at once, but by degrees. It was at first only used by such as were entitled to those distinguishing symbols — by the nobility and gentry only. For Lucie, Chief Justice of Henry II., reprimanded a common man who had made use of a seal, saying that belonged to the nobility only. Terms de ley, ubisupra, and several other books. But it is to be remarked that about this period, and for some time before, the common people had but little use for seals, as they could have but few contracts. The conquest had introduced the maxim of non-alienation *Page 146 
without the consent of the lord. A great number of them were villains, who could not acquire property at all but for their masters; and as to the feudal tenants, they were continually harassed by attending their lords in war. Commerce had not yet begun to flourish and increase the personal property of the nation. The old law authors of those times have scarcely a chapter upon personal property. 2 Bl. Com., 385. And even when the doctrine of nonalienation began to wear away imperceptibly, the common people, being not entitled to any family distinction, had no seals, and were obliged to contract as formerly was used before the introduction of sealing. The uncertainty of such a method begat, in combination with other circumstances peculiar to those times, the practice of conveying by fine; where the whole transaction, with the precise terms of the conveyance, were recorded in one of the King's courts, and obviated completely any future controversy respecting the execution of a deed. At length, however, the eyes of the nation began to be opened to their true interest; trade flourished; agriculture was encouraged; personal property increased; lands, or part of them at least, began to be freely alienated; they were made liable to answer the debts of the (199) merchant and, as to part of them, the debts of any other proprietor. Contracts, both for real and personal property, became frequent among all ranks of men. The necessity of authenticating their written contracts became urgent. They of course used the best mode then known. They broke through the privileges of the nobility and gentry, and made seals with such impressions as each man's fancy suggested to be the properest mark for distinguishing his contracts. By the time of Edward III. seals were in general and common use. Terms de ley, ubi supra. Cunningham, title "Deeds," who cites Perkins, 229, and sequentia. And it became a rule of law that a deed could not be constituted without a seal; and the method of signing with the sign of the cross, or some other mark, had gone into total disuse. Thus it seems clear that the seal was originally introduced in the place of signing, as an evidence of the identity of the writing which contained the party's agreement, and afforded a full proof thereof by the inspection of its impression only; and signing by the party was held unnecessary and useless. In reality it could contribute but little to the proof of the writing, as long as the illiterateness of the people continued, which was until some time after the introduction of printing into England, in the time of Edward IV., insomuch that as late as the time of Henry VII, the being able to read was held to be a legal proof of a man being a clergyman, or clerk in orders. 4 Bl. Com., 360.
This universal use of seals, however, produced its inconvenience, when every man who made a contract was obliged to use a seal to authenticate *Page 147 
it. Many of those seals were not known to the jurors, and they could not determine in many instances on the authenticity of the instrument upon the inspection of the seal only. They were under a necessity, therefore, to call upon those who were supposed to know the seal which the party used, to say whether that was the impression of his seal or not; and upon this evidence they decided, and sometimes upon the comparison of the seal with the impressions upon other instruments which were proved to be sealed by the party. But still, in contemplation of law, these seals were held to contain an intrinsic evidence in themselves of the contract to which they were affixed; and, therefore, as well as for the purpose of being compared, the rule of law was that they should be carried out by the jury. Gilb. Law of Ev., 20. But with respect to those seals which still retained sufficient distinction in (200) themselves, as the great seal, the seals of the courts of justice, the seals of corporations, and some others, no proof as to them was required or perhaps was allowed. They still continued to answer the genuine purposes of seals at their first introduction, and were full evidence of themselves. The people began, at length, to forget the original use of this institution, and to seal with any impression they could get; and the law, rather than invalidate the whole transaction, left it to the jury to decide whether that was the seal of the party or not.
In this country the people have departed still further from the true use of seals, by not making any impression at all, scratching something like a seal upon the margin of the paper, and making that pass for a seal. To the first of these abuses the law has conformed, and will now deem the sealing to be sufficient if found by the jury to be the seal of the party. For fear of destroying some contracts improperly made at first, it has relaxed from strict propriety, and the practice of sealing with any impression has become general; and is now, from necessity, allowed to be good in every instance. Cunn. verbo "Deeds," cites Perkins, 129, 34; Cro. Car., 149; Gilb. Ev., 20. But still the contemplation of law is in conformity to the ancient use of seals. They are deemed the signs of authenticity, are supposed to have an intrinsic evidence in themselves, and for that reason are carried out by the jury. Gilb. Law of Ev., 17, 20, cites Sid., 145; Hard., 118; Plowd. Com., 411; and Sir Edward Coke, speaking of deeds, page 6 h, says: "Also the deed may receive credit per collationem sigillorum,scripturae," etc., and Baron Gilbert, in his note upon 2 Bac. Ab., 494, says: "The seal appearing, it must be presumed to be put there by the parties to the deed," and cites Leo, 25, Owen, 23, and Bend., 1.
In the reigns of Henry VII. and Henry VIII. learning, and the art of writing, had become much less general than in former times, and by *Page 148 
this time also seals had become much less a mark of distinction, and proof of the individual contract made by the parties, than in former reigns; but the rule that the deed must be authenticated by the party's seal had passed into settled law. In order, therefore, to give a sure proof of the seal which proved the writing that contained the agreement of the party, subscribing his name at the foot of the instrument, immediately after its conclusion and prefixed to the seal, in the same place and in the party's own handwriting, began to be used. Noy., 163. (201) And although it was held in conformity to the rule then established, and which has ever since continued, that such a signature was not necessary to the essence of the deed, yet where the jury could not decide with respect to the deed, upon inspection of the seal merely, not be satisfied by a witness who knew the impression, nor by a comparison of the seal in dispute with other seals made use of by the same party, they were allowed to form their judgment upon the handwriting of the party prefixed to the seal; and that was the scripture intended by Sir Edward Coke, in the passage above cited, where, speaking of the doctrine of deeds and of presumption, he says: "Also, the deed may receive credit, percollationem sigillorum, scripture, etc., et super fidem cartarum: mortuistestibus erit ad patriam, de necessitate, currendum." Co. Litt., 6 b. It may be here supposed he meant the handwriting of the witnesses; but this is not his meaning, for he says expressly, in the very next page, that the clause of hiis testibus is not essential to the deed; and in page 6a he says: "Very necessary it is" (by which he means advisable or prudent)" that witnesses should be underwritten or endorsed for the better strengthening of deeds" (not that it is absolutely necessary to make them valid) "and their names, if they can write, written with their own hands." (not that they must necessarily be subscribed with their own hands). Even at this day there were many witnesses who could not write their own names, and their names were to be endorsed; and when these witnesses, namely, witnesses who had not subscribed their names in their own handwriting, could not be found or were dead, then the deed was to receive credit per collationemsigillorum et scripturae, coupled together. This proves the position that the signature of the party was used as a proof of the seal. If it was not evidence of the seal, then it was in vain to prove the handwriting at all; for that of itself was totally unessential to the deed, and made no part of its essence, as the same author had said in the page last preceding, and as is held to be law at this day. Salk., 462, pl. 2. And, that the proof of the signature of the party, when admitted, is used as a proof of the seal, is avowed in terms almost unequivocal, by Baron Gilbert, Evidence, 99, 103, where he *Page 149 
says: "For though the deed be produced under hand and seal, and the hand of the party that executes the deed be proved, yet this is not full proof of the deed, for the delivery is necessary to the essence." Does not this manifestly imply that the proof of the handwriting proves everything, which is of the essence of the deed, but (202) delivery only, and, of course, that it proves the seal?
With respect to an attested sealed instrument, it is the common practice in the English courts, where the witnesses are not to be found, to prove both the handwriting of the witnesses and of the party. Bl. Rep., 532;Forbes v. Wale, such proof admitted before Lord Mansfield to be given. 2 Brown Ch., 536, 538. The same proof admitted before the Lord Chancellor, and stated by the counsel opposed to the fact it meant to establish to be evidence in the common form. The same proof must also have been admitted inGould v. Jones, reported in Bl. Rep., 384, as may be seen by having recourse to the case itself; and the same kind of proof was clearly admitted in Coghlan v. Williamson, 1 Doug., 93. But why in all those cases is the proof of the party's signature held necessary, if proof of the witnesses' handwriting proves both sealing and delivery, and not the delivery only? From the reason of the thing itself, and more especially from the great weight of these combined authorities, it seems to be a conclusion fairly warranted that at this day, whatever it might have been formerly, the seal is in some instances proved by the signature of the party. This holds in all those instances where the signature of the party is admitted to be proved, and that the seal always since its first introduction has been used as an evidence of the writing, in which the party has deposited his agreement.
3. With respect to the delivery, I have no more to add to what has been already said relative to its coming into use instead of the livery of seizin, and being like that, made in solemn form coram paribus, to the end it might make the deeper impression in their minds, than that this solemn delivery of the deed coram paribus, being found to be well calculated to make the desired impression in the case of landed contracts, and, also, from the same solemnity, to excite in the party a reflection upon the subject he was engaged in, it was continued in other contracts, and, like the seal, was considered an essential ingredient to the constitution of the deed. Here it may not be improper to remark upon the excellence of this institution when once established, though introduced gradually and for other purposes, in preventing all manner of surprise upon the party. It was first to be written; this necessarily employed some time; he had the interval for reflection; it was to be read over to him if he requested it, then the wax was to be prepared and melted; (203) *Page 150 
next a seal to be procured; then an impression to be made; thus gradually approaching to the final act, still giving time for reflection, and exciting by each new act still greater apprehensions; and last of all, lest the former precautions might not be sufficient to put him upon reflection, he was called to go before the pares of the neighborhood and make a solemn delivery of the instrument. After all these ceremonies were complied with, it was scarcely possible to believe that the party was circumvented by fraud or surprised into what he had done. After the pares were disused, and the authority of the county and hundred courts diminished, I apprehend a delivery before the pares went out of use, but that a delivery of the contract was still used as a sign of the party's assent to the contract contained in the deed, and has ever since been deemed necessary to give it its final validity.
Such seems to be the origin and progress of the several circumstances of writing, sealing, and delivery of deeds, which came into use, not all at once, but at different periods of time, and were used for perpetuating, authenticating, and proving the complete and final assent of the party to his contract. Any other concomitant circumstances, besides those, though they have been sometimes used, and said to be incident to deeds, as signing by the party, subscription by witnesses, and many other, as may be seen in Co. Litt., 7 a, yet they have never at any period of time been held material to the essence of the deed, unless, perhaps, in some instances where such circumstances have been required by statute: and that these are the only necessary circumstances is proved by all law writers, both ancient and modern. Co. Litt., 7 a, says: "I have termed the said parts of the deed formal or orderly parts, for that they be not of the essence of a deed of feoffment; for if such a deed be without premises, habendum, tenendum, reddendum, the clause of warranty, the clause of in cujus rei testimonium, the date and the clause of hiis testibus, yet the deed is good; for if a man by deed gives lands to another and his heirs, without more saying, this is good, if he put his seal, deliver it, and make livery accordingly." Wood in his Institutes adds: "where livery of seizin is necessary," importing, as Lord Coke clearly did, also, that if it were not a deed of feoffment, but a deed of some other kind, then putting the seal and delivering the writing would make it a good deed. The same definition is given, and the same circumstances (204) only mentioned as necessary, in 2 Rep., 4, 5; 10 Rep., 92; 3 Bac. Ab., 393; 2 Bac. Ab., 493, who cites 2 Roll's Ab., 21; 1 Nels. Ab., 623; Terms de ley, verbo Fait; Co. Litt., 171 b; Gilb. Law Ev., 78; Sheppard's Touchstone of Common Assurances, and many others. *Page 151 
After the production of this concurrent testimony of so many authors, it seems scarcely necessary to say that the subscription of witnesses in their own handwriting to a deed was never held necessary to its constitution. The reasons already assigned for the first introduction of seals and their continuance for a long time afterwards, namely, the illiterature of the laity, proves also that the subscription of witnesses was not used during that long period, which commenced soon after the conquest and continued to the time of Henry VII. and Henry VIII. Even theMagna Carta of King John, given at Runnymede in 1215, mentions the archbishops, bishops, barons, etc., not particularly naming them, and in the end is attested in this manner, testibus supra dictis et multis aliis;
and lest anything should be added or subtracted from the form of the writing, he thereto put his seal. Bl. Law Tracts, 35, 36. In 1216 the first charter of Henry III. is attested thus, testibus omnibus prenominatis,et multis aliis. I infer from this that in a matter of so much moment they certainly used the best method of attestation then known or used, and as they did not subscribe their names, it is an evidence that the subscription of witnesses in their own handwriting was then not practiced. The attestation of private deeds was in the same manner — the names of the witnesses were underwritten or endorsed, and this was used only as a memorandum to show who of the pares were present, to the end they might be called upon and associated to the jury, upon the trial of the issue, when the deed was denied. Vide Co. Litt., 6 a and b. And sometimes it was said, teste comitatu, hundredo, etc. 2 Bl. Com., 307. I apprehend the practice of subscribing by the witnesses came into use at the same time with the subscribing by the party — at a time when the law respecting deeds was already firmly established, and when both these circumstances were held unessential, though perhaps both of them at the time might be useful — the signature of the party to prove his seal and that of the witnesses, when they could not be found to prove the delivery of the deed; for when it was proven by his own signature to be the seal of the party, there arose a very strong presumption from the proof of the handwriting of the witness that they had been present at the delivery. But this kind of proof was only resorted to when positive testimony could not be procured, and was not in (205) the party's power to produce.
To proceed a little further, the statutes of 2 Edw. II, and 9 Edw. III., speaking of the trial upon the issue non est factum, say: "The witnesses shall be summoned where there are witnesses named in the deed, but if they do not appear at the day appointed, the trial shall proceed notwithstanding their absence." Hence the conclusion follows that in those *Page 152 
days there were some deeds without witnesses named in the deed, and as to them there was no delay of trial. Secondly, that there were other deeds wherein witnesses were named, and that as to them the trial could not be in their absence, for they were to be summoned and make part of the jury. Thirdly, this statute directs that they shall be summoned as usual, but in case of their nonappearance the trial shall, nevertheless, go on by the jury that are present. Fourthly, that there was some other method then used of proving a deed than by the witnesses named in the deed, or else this statute operated injustice by ordering the trial to proceed upon the first default of the witnesses (who perhaps might be convened at another day), and by so doing rendered the deed invalid and void; and this it is unfair to presume. That it could be proved by other means is held by Lord Coke 121 b, where he assigns reasons why the law requires the profert of a deed in pleading to the court, viz., that it may be proved by the witnesses, or other proof, if denied. This opinion is strongly confirmed by some modern decisions, where the rule of law is held to be that a witness shall not be permitted to deny his own attestation. The true meaning of which rule is, that if he does deny it upon the trial, the deed may be proved by others who were not attesting witnesses, and whose names were either subscribed nor endorsed. Doug., 216; 4 Bur., 2225. This proves beyond all possibility of doubt that the attestation of witnesses is not necessary; for if the delivery may be proved by persons who did not attest, in case of an attested deed, can there be any solid reason assigned why they may not prove the delivery in case of an unattested deed, where there are no witnesses to deny their attestation, and by that means bring a suspicion on the instrument? Upon this point I think it may be affirmed, in perfect consonance with the rules of law, that at this day the attestation of witnesses, either by endorsing or underwriting their names in the handwriting of the drawer of the deed or by a subscription of their names in their own handwriting, is in nowise essential to the validity of the deed; and (206) from all those premises we may also infer some other conclusions.
If writing, sealing, and delivery be the only essential parts of a deed, and the law deems it valid without the further ceremony of a subscription by witnesses, then there must be some other competent means of proving the deed otherwise than by subscribing witnesses. It would be absurd to attribute validity to an instrument that had these essential parts, and yet say it should not be read to benefit the party producing it, unless proved by subscribing or endorsed witnesses.
But what other means are competent? *Page 153 
To form a decided opinion upon this head, we must remember that there is but one general rule in relation to evidence, and that is that the law requires the best evidence. But this rule is always relaxed upon two grounds, either from absolute necessity or a necessity presumed from the common occurrences amongst mankind. The rule is not so stubborn but that it will bend to the necessities of mankind and to circumstances not under their control. The rule is adopted only to obviate the fraud of mankind. One shall not deceive the jury by offering a less convincing testimony to establish his point, when it appears there is a proof more elucidative of the point in controversy in his own possession or power, which perhaps he does not offer because it would be decisive against him. It was never meant to exclude the party from justice merely because he had not, through ignorance, provided himself originally with the best evidence it was possible for him to provide; for then two witnesses would be better than one, a hundred better than two, and so on progressively. A writing would be better than a parol contract, a deed better than either, and a record better than all. Neither was it intended to deprive any one of justice when, without any default in himself, he had lost the better evidence which he had provided originally. It first deprives him of the power of imposing upon us, and then lays itself open to be relaxed as circumstances shall in justice require. These circumstances, as I began before to mention, are of two kinds: those founded on absolute necessity and those founded on a necessity occasioned by those occurrences which are common amongst mankind. We will touch upon the first class only.
In the case of deeds, if there be subscribing witnesses to them (see 1 Aikins 49, the argument of Lord Hardwicke, in the celebrated case, Omichund v. Baker, and mark the implication), they must (207) be proven by these witnesses, because it is presumed that these witnesses can give a more distinct and satisfactory relation than any others, having been called upon originally for that purpose; but if the witnesses be dead, or not to be found, and that be proved to the court, then the handwriting of the subscribing witness may be proved, that raising a violent presumption in favor of the deed. If the deed be lost, and that appear to the court, then the copy shall be read, as affording a presumption. But if there be no copy, then an abstract may be admitted, that affording a probable presumption; and if no abstract, parol evidence of the contract may be offered. The true intent of the parties to be regulated by that contract shall not be defeated and justice overturned so long as any evidence remains which throws any glimmering of light on the subject, from which a jury may be enabled to infer the *Page 154 
real state of the transaction. The subscribing witnesses in the case above stated are not required, because the deed cannot be proved without them, as has been already evinced; but because were they not produced, the defendant would be deprived of the cross-examination of those persons he had provided to give testimony for himself, as well as for the other party, and who, if produced upon such cross-examination, would perhaps give material testimony for him. But if the subscribing witnesses are not to be had, the law chooses the least of two evils. It is better to dispense with the witnesses, and receive other proof which may be sufficient, than adhere to the rule when they cannot be had, and so, at any rate, destroy the deed. Thus, if the obligee removes the witness, his acknowledgment that he executed the deed is proof. H. Bl., 623. In all cases, therefore, where it is apparent to the court that there is no positive testimony to be had, there must be a recurrence to testimony founded on presumptions, or circumstantial proof, as it is called. Therein requiring, first, the best presumptive proof that is to be had, and in default of that, the next best, until we have passed through all the several grades of circumstances that raise presumption, from that which Lord Coke terms the violent, until we arrive at that which excites the light presumption that moveth not at all.
If this be the true theory of evidence, and if an unattested deed, being valid, may some way or other be proved, as it certainly may, then in the first place the party must produce witnesses who were present at the execution, though not endorsed nor subscribed; as in the case (208) where subscribing witnesses to an attested deed deny it, and if there are no such witnesses, then there must be a recurrence to presumptive testimony. And here, as in the case of an attested deed, when the witnesses were not to be had, proof of the party's signature would be admitted as a proof of his seal; so in the case of an unattested deed, I can see no reason why the same species of proof should not be admitted, where no better is obtained. There, also, Lord Coke's doctrine, so often before cited, of comparison by seals, handwriting, etc., might be admitted. The law also will here choose the least of two evils; and if sufficient proof of the seal shall be offered, other circumstances shall be admitted to prove the delivery. This is yet necessary. But a small matter is sufficient to establish it, when once the seal is proved to the satisfaction of the jury, as leaving the deed behind him after it was sealed and read, held a good delivery. Cro. Eliz., 7; Shippen's case. So where an obligation was written in a book, and the party put his hand and seal to the leaf in which it was written: adjudged this was sufficient, though there was no evidence of a delivery. Cro. Eliz., 613; *Page 155 Fox v. Wright, and many other cases to the same effect. If no positive testimony can be given of a delivery, the party must be allowed to prove such circumstances as will induce the jury to find a delivery. In these two cases last cited it is surely more compatible with justice, and the rule of evidence in similar cases, to admit than at once destroy the deed by rejecting such circumstances which the jury might deem sufficient to convince their minds, together with other circumstances they might themselves be acquainted with. Surely there are a great variety of circumstances from which a delivery might very properly be inferred. Suppose a deed of feoffment produced, and the handwriting of the party proved, and also possession according to the deed. Co. Litt. 6 b.; Gilb. Law Ev., 100. Suppose part of the principal be paid upon a bond by the defendant, or interest; or suppose the bond should be shown to him, and he requested the party not to bring suit upon it; suppose the bond sufficiently described in a letter and acknowledged. 2 Nels., 762, pl. 45; 2 Eq. Ca. Ab., 413, pl. 9. Suppose upon the back of the bond he enter an endorsement taking notice of it as his bond. Buller 254; C. K. B. 500. Suppose he state it in a bill or answer in chancery. Buller, 236. Suppose he had made a parol confession of it. Doug., 92, 216, in which last case the proof evidently would have been deemed sufficient had there been no subscribing witness. Or, by like parity (209) of reason, suppose any other possible circumstance from which a jury might justly and fairly infer a delivery: surely it ought to be received. Even the possession of the obligee, where the other party could not show the illegal commencement of that possession, might afford a presumption in favor of the deed. But, as there is no case to warrant me in going so far, I will not yet say that that circumstance alone should be left to the jury. But such circumstances as are before mentioned, and all others of equal weight, I do think should be left to them, to infer a delivery from or not, according to the best of their judgment.
Therefore, in the case stated, I am of opinion that the witness was properly admitted to prove the signature of the defendant; and that the jury were at liberty to infer from thence that the seal affixed was the seal of the party; and as the admissibility of this evidence is the only doubt stated, as the jury have found a verdict in favor of the plaintiff subject to that doubt only, it must be intended there was some other circumstance given them in evidence sufficiently evincing the delivery; and, therefore, as to the first objection stated in this special case there ought to be judgment for the plaintiff, notwithstanding.
It seemed to be insisted on at the trial that the clause "In witness whereof, I have hereunto set my hand and seal," might be received as *Page 156 
an evidence of the seal; and as some case may hereafter occur in which that clause may have only the words "In witness whereof, I have hereunto set my hand," when in fact there may be a seal affixed, I will remark upon this clause a little; more especially as it is set down in this special case, and the opinion of the Court is expected upon it. I would observe, then, in the first place, that this clause contains a part of the words of the deed, and the deed itself, or any part of it, cannot be read until the sealing and delivery of it be first proved; and, of consequence, this clause cannot be read to prove the seal until after the seal has proved the clause itself; and then as to the purpose of its proving or disproving the seal, it is totally useless; and that such a clause is not only unnecessary in itself; but that the words of it have always been disregarded, is proved by such an abundance of authorities that the bare citation of them will fully establish the position that the omission of this clause or the addition of it, or the words of it, can have no influence whatever (210) upon the writing itself. Some of them are the following: Co. Litt. 7 a; Salk., 714; 2 Rep., 5. The deed is good, though this clause be omitted. 2 Nels., 623, pl. 7, who cites Moor 3. It is not a conclusion of the deed, for that which is written after it is as much part of the deed as that which is written before. Also 2 Nels., 621, pl. 13, who cites 3 Bulstrode, 300. "In witness whereof, I have hereunto set my hand." The deed is good, if there be a seal, though the clause do not mention the seal. Cunning. Dict. verbo Deeds, cites Hetly, 75, and by the like reason, if it mention hand and seal, still it can operate nothing. 2 Str., 814, 815; L. Ray., 1541. For the seal is not established by the words of the writing, but e converso, the words contained in the writing are proved to be the words of the party by his seal. And if the words contained in this clause were allowed to prove anything, the party to be benefited by the deed would have nothing to do but to insert this clause. "In witness whereof, I have sealed and delivered," and the evidence of the deed would be complete. Suppose in the present clause that the word seal had not been in the clause, and yet the seal should appear, with the word seal within it, in the handwriting of the obligor, as was the fact here: would it not be a harsh determination to say it was not his seal? Yet we know such cases often occur.
1. It may be objected that if the words contained in this clause are not suffered to have any weight, then the holder of a promissory note might add a seal to the name of the party; and by that means avoid the act of limitations, and also circumscribe the party in point of evidence. To this, the answer is that the rules of evidence were established long before the statute of limitations, and that act did not intend to alter them. *Page 157 
2. That the law has guarded against such attempt by making the writing totally void, if it should be attempted; and also subjected the party to very severe punishment for the attempt.
3. If there are witnesses, they may be produced to say what they know of the seal.
4. If there are no witnesses, the circumstances to prove a delivery may throw some light upon the seal itself.
5. The law will not presume such turpitude in any man. The possibility of his committing such an offense will not vitiate the act, as if he had actually committed it; and in this case, as in all others, the injured party should prove the injury done him. Again, if the instrument should be held invalid, because, possibly, the seal might (211) have been affixed after the execution of it, then more good deeds would be destroyed upon suspicion than frauds prevented by it; for few men will attempt a fraud of this kind, under the multiplied hazard of receiving infamous corporal punishment and being forever degraded from their rank in society, and the total loss of the thing secured by the deed, especially if it be of great value. Experience shows that men, not well knowing the technical distinction between a seal and their signature, say, witness their hands, and put their seals also, and e converso, declare in this clause that they have put their hands and seals, where they have subscribed their names only. Here, as in all other cases, the law chooses the least of two evils. Once more, the subscribing witness to a bond may have subscribed, being about to depart for a foreign country, when, in fact, the deed may not have been executed; but this possibility will not cause a rejection of such testimony, nor shall the seal be rejected because not mentioned in the clause, for such possibility as is in the objection.
But it may happen in the case of an unattested bond that there may not be sufficient evidence by circumstances to prove the delivery; and this brings us to another question referred to the Court in this special case, which although it is not necessary to be considered in order to the determination of the case, which is an action of debt, and depends entirely upon the question whether this be the deed of the party or not, yet, as it has been referred to the Court, I suppose, for the purpose of having the law settled upon this point, also, I will make a few remarks on it.
The question is, whether an action on the case lies upon such an instrument, when it cannot be proved as a deed.
As to this, there is one rule certain, that no sealed instrument can be given in evidence to support an action on the case. Gilb. Law Ev., 100; *Page 158 
Cro. Jac., 506, 508. The law has given a remedy of another sort upon those sealed instruments. An action on the case depends upon parol evidence or writing only. Therefore, the action on the case must necessarily be destroyed when the evidence to support it is destroyed by extinguishment; and all parol contracts and agreements are held to be extinguished when they become clothed in a contract of greater solemnity, or evidenced by a sealed instrument, as these sealed instruments are themselves extinguished, so that no action can be supported upon them between (212) the same parties, when they have passed in rem judicatan, and have become matter of record. All this depends upon the rule of law already mentioned, that the best evidence shall be required. Thus, a bond shall not be evidence when there is a record of the same matter, nor parol evidence when there is a sealed instrument. This rule of law is not to be denied; and then the whole question is reduced to this — whether, when a seal appear, the party who produces the writing to which it is affixed shall be permitted to say it was not affixed to the writing originally? It has been for a long time a standing rule of law, framed first, indeed, for the protection of deeds, the only written instrument then in use, for unsealed instruments are but of modern date (3 Term, 330), but in policy extended to every written contract, that the least alteration in any material part shall render the whole totally void; and even an immaterial alteration, made by the holder of the instrument, shall make it void also. 11 Rep., 27. A bill of exchange, payable three months from 26 November, was held to be totally void; it being found by the jury that the top of the figure 6 was blotted out, while in possession of the holder, so as to make it appear to be the 20th instead of the 26th, and by that means to accelerate the payment, though in fact no such acceleration of payment had been attempted. 3 Term Rep., 320.
Now, then, to apply these rules to the case in hand. If the seal was not affixed to the instrument at the time of its execution, and the addition of the seal afterwards be an immaterial alteration only, then the instrument being in possession of the holder or obligee, the presumption will be that it was added by him, and will turn it upon him to prove how it came there like the case where the seal was torn off by a child — this raised a presumption of the deed being canceled, and turned it upon the plaintiff to show how the seal came to be torn from the writing. Cro. Eliz., 120; Palm., 403; Latch, 226. In the case of the bill of exchange, Lord Kenyon, speaking of the blot which made the alteration, said if it had been done by accident, that should have been found to excuse the party. He thought the alteration having been made after the instrument came to the possession of the payee, raised so strong a *Page 159 
presumption of his guilt that in point of law the instrument should be deemed void unless it could show the blot happened without his privity. And so I am induced to think in the present case, that if the addition can be considered as an immaterial addition only, yet to make men careful to preserve their written instruments free from alteration (213) or addition, it is good policy in law to suppose the alteration or addition made by the holder or obligee himself; therefore, the moment he shows a sealed instrument, and says the seal was not originally affixed to the writing, the whole instrument must be deemed void, unless he can show that the seal was affixed to it without any privity of his. But I take it, the addition of a seal is not an immaterial alteration only. It avoids the act of limitations; it excludes the giving of parol testimony to explain or control the writing in any shape; it makes the party liable to another kind of action than that he at first stipulated; it deprives him of that latitude of evidence he might have had in the action on the case, and, before the act for the amendment of the law, would leave him, in the case of a single bill as this is, no method of discharging himself but by a release or acquittance under seal. In every point of view, therefore, the addition of the seal is a most material alteration; and if it be material, then no matter how it happened, or by whom the alteration was made, the whole instrument is totally void, and no action whatever can be supported upon it, no more than if the seal had been torn off to make way for proof of the writing as a simple contract. The law requires that the contract shall remain unaltered; that the party may not be subjected in any other shape or manner than that which he has consented to. Besides, if when the signature of the party is proved, that stands as presumptive evidence of his seal, then an unattested instrument being produced, and the handwriting of the party proved, the presumption instantly arises and will stand for truth until the party plaintiff shall overturn it by evidence, accounting for the affixing of the seal, and that it was done without the knowledge of the plaintiff, or any criminal intent in him; and so quacunque via data, the seal appearing, it must be accounted for, to say the least, by the plaintiff himself. And therefore I am of opinion, upon the last point reserved in this special case, that debt is the proper action to be brought upon such an instrument as is therein stated, and that the action of the case can, in no instance, nor in any possible case whatever, be supported upon it; and this opinion receives credit from the argument of JusticeHeath, in Gibson v. Minor, H. Bl., 622, where, arguendo, he lays it down as clear law that if the delivery of a bond cannot be proved, it *Page 160 
(214) cannot be concluded that it may be given in evidence as a note should, because the creditor having taken his security in a determined form, he cannot at his pleasure alter it against the stipulation of the debtor; and yet, says he, the obligation includes a promise to pay money.